Jessica Eaves Mathews (*pro hac vice pending*)
jessica@leveragelegalgroup.com
Leverage Legal Group LLC
1700 Westlake Avenue N, Suite 200
Seattle, WA 98109
Telephone: 888-505-5838

Mika Mooney (NY Bar No. 4549036)
mika@mikamooneylaw.com
Mika Mooney Law, PLLC
191 Main St., #528
Port Washington, New York 10050
Telephone: 516-206-2018

Attorneys for Plaintiff
FITS EVERY BODY TO A T, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FITS EVERY BODY TO A T, INC., a New York corporation, <br><br> Plaintiff, <br><br> v. <br><br> SKIMS BODY, INC., a Delaware corporation, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Fits Every Body To A T, Inc. ("Plaintiff"), by and through its undersigned

counsel, alleges as follows against Defendant SKIMS, Inc. ("Defendant"):

1

## **NATURE OF THE ACTION**

1.     This is an action for trademark infringement under 15 U.S.C. § 1114, false designation of origin and unfair competition under 15 U.S.C. § 1125(a), and related New York common-law and statutory claims.

2.     This case involves likelihood of confusion, including reverse confusion, where consumers are likely to mistakenly believe that Plaintiff's goods infringe upon, originate with, are affiliated with, sponsored by, or authorized by Defendant, a vastly larger and more powerful junior user. More specifically, this is a case in which a celebrity-founded, billion-dollar company identified a trademark owned by a small, self-funded woman-owned business, recognized that the small business owner would likely lack the resources to fight back, and made a calculated decision to take the mark anyway, relying on its overwhelming financial resources, celebrity connections, and marketing machine to simply crush the senior user out of existence.

3.     According to sworn statements submitted by Defendant's own Vice President of Performance Marketing to the United States Patent and Trademark Office, Defendant has generated over $407 million in gross revenue from sales of goods bearing the Infringing Mark since September 2019 through 2024, including over 14 million units sold. He claims these revenues have grown exponentially each year – from $2 million in 2019 to $144 million in 2024 alone, while Defendant has simultaneously invested millions of dollars in marketing campaigns featuring high-profile celebrity endorsements, achieving a social media reach of over 3 billion impressions in 2024. Based on publicly available information, including statements made in connection with Defendant's November 2025 funding round led by Goldman Sachs Alternatives, Defendant's total company revenue exceeded $1 billion in 2025. Defendant's own marketing materials consistently describe the "FITS EVERYBODY" collection as its "best-selling collection"

and "top rated collection," and independent retail tracking data indicates that the Underwear & Socks category, which includes the core "FITS EVERYBODY" products, accounts for approximately 45-50% of Defendant's weekly e-commerce sales. Applying this proportion to Defendant's projected 2025 revenues of over $1 billion, and accounting for continued growth into 2026, Plaintiff estimates upon information and belief that Defendant's cumulative revenues from goods bearing the Infringing Mark from 2019 through March 2026 now exceed $700 million using conservative estimates, and may exceed $900 million when applying independent retail tracking ratios. These figures, including those admitted under penalty of perjury by Defendant's own officer and corroborated by independent market data, establish the massive scale of Defendant's infringement, despite Plaintiff's numerous attempts to defend its trademark rights, the enormous unjust enrichment Defendant has obtained through unauthorized use of a mark confusingly similar to Plaintiff's senior mark, and provide a concrete basis for the disgorgement of profits, damages, and enhanced remedies Plaintiff seeks.

4.      Plaintiff alleges that Defendant's conduct violates the Lanham Act because it is likely to cause confusion as to source, sponsorship, or affiliation and threatens to overwhelm Plaintiff's goodwill and brand identity. Plaintiff is a small, woman-owned business that has relied on organic growth and self-funding to build its brand. Defendant's adoption and aggressive promotion of a confusingly similar mark, backed by hundreds of millions of dollars in marketing and celebrity endorsement, has effectively blocked Plaintiff from expanding into the very market space its registered trademark was intended to protect.

5.      This case presents a textbook example of intentional infringement by a massively resourced junior user against a vulnerable senior user. Defendant continued and expanded its use of the Infringing Mark after receiving repeated, unequivocal notice of Plaintiff's senior rights,

including through a cease-and-desist letter, a Director-level Letter of Protest reviewed by the USPTO, and multiple USPTO refusals culminating in a final refusal. A company with fewer resources might have reconsidered upon receiving such notice. But Defendant, backed by the personal fortune and celebrity platform of Kim Kardashian, had no reason to reconsider. Defendant believed it could simply outspend, out-market, and outlast any legal challenge from a small business owner.

6.      Plaintiff seeks injunctive relief, disgorgement of Defendant's profits, Plaintiff's damages, treble damages, attorneys' fees and costs to the extent permitted by law, and all other relief the Court deems just and proper.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a).

8.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1338(a) because this action arises under Acts of Congress relating to trademarks.

9.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Based on Defendant's own sworn statements submitted to the USPTO, Defendant has generated gross revenues exceeding $407 million from sales of goods bearing the Infringing Mark through 2024, including $144 million in 2024 alone. On information and belief, Defendant's 2025 revenues from goods bearing the Infringing Mark have continued this upward trajectory, bringing total revenues to well over $500 million. Based on Defendant's own sworn statements submitted to the USPTO and corroborated by independent market data, Defendant has generated gross revenues exceeding $700 million from sales of goods bearing the Infringing Mark

through Q1 2026, with cumulative revenues potentially exceeding $900 million when applying the revenue proportions indicated by independent retail tracking data.

10. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

11. This Court has personal jurisdiction over Defendant because Defendant transacts business in New York and this District, advertises and sells goods to New York consumers (including via e-commerce), and has caused injury to Plaintiff in New York. Defendant purposefully avails itself of the privilege of conducting business in New York through substantial, systematic, and continuous contacts with the state. Defendant operates a permanent flagship store at 647 Fifth Avenue in New York City – a 6,570-square-foot, three-level retail location that opened in December 2024 – *after* receipt of Plaintiff's cease-and-desist letter, dated September 13, 2024 – in a building formerly occupied by Versace. Defendant's founder, Kim Kardashian, personally hosted a star-studded grand opening party for the store attended by numerous celebrities. Defendant has also conducted multiple pop-up retail activations in New York, including at Rockefeller Center (May 2023), SoHo (January 2025), Bloomingdale's on 59th Street (March 2025), and Times Square, where Defendant installed a 60-foot balloon of Kim Kardashian to promote its swimwear collection (March 2025). Defendant launched its NikeSKIMS collaboration at Nike's House of Innovation store in New York City in September 2025. Defendant sells goods bearing the Infringing Mark to New York consumers through its retail stores, e-commerce platform and through wholesale partners including Nordstrom, Bloomingdale's, and Saks Fifth Avenue, all of which operate flagship stores in New York City. Defendant's contacts with New York are deliberate, extensive, and directly related to the claims in this action.

12. Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this District and a substantial part of the events giving rise to the claims occurred here.

## PARTIES

13. Plaintiff Fits Every Body To A T, Inc. is a New York corporation with its principal place of business in New York, New York.

14. Plaintiff is a small, self-funded, woman-owned apparel company that designs, markets, and sells apparel and related goods. Unlike Defendant, Plaintiff does not have access to celebrity founders, institutional investors, or multi-million-dollar marketing budgets. Plaintiff built its brand and its trademark rights through years of hard work, personal investment, and organic growth – not through the overwhelming market saturation that only vast celebrity connections and financial resources can buy.

15. Defendant SKIMS Body, Inc. (formerly SKIMS, Inc.) is a Delaware corporation with its principal place of business in California. Defendant was founded in 2019 by Kim Kardashian, a billionaire celebrity, media personality, and one of the most-followed individuals on social media in the world. From its inception, Defendant has had access to extraordinary financial resources, celebrity connections, institutional investment, and a built-in marketing platform of hundreds of millions of social media followers – advantages that no ordinary startup, and certainly no small business like Plaintiff, could ever hope to match. Defendant has raised approximately $956 million in total funding from investors including Goldman Sachs Alternatives, Wellington Management, Greenoaks Capital, and Thrive Capital. Defendant reached a valuation of $5 billion in November 2025 and projects revenues exceeding $1 billion for 2025. The Goldman

Sachs press release announcing the funding round is attached hereto as **Exhibit A**. Related coverage from CNBC and Retail Dive is attached hereto as **Exhibits B** and **C**.

16. On information and belief, Defendant advertises, offers for sale, and sells apparel and related goods nationwide, including within New York and this District.

**FACTUAL ALLEGATIONS**

**Plaintiff's Mark, Priority, and Protectable Rights**

17. Plaintiff is the owner of the trademark FITS EVERY BODY TO A T (the "Plaintiff Mark").

18. Plaintiff has used the Plaintiff Mark continuously in United States commerce since at least 2018 in connection with apparel and related goods.



19. Plaintiff owns U.S. Trademark Registrations for the standard-character marks FITS EVERY BODY TO A T on the Principal Register, No. 5,649,583 (filed December 4, 2015, Notice of Allowance granted March 21, 2017, and registered January 15, 2019) for International Class 25 for: clothing, namely, bathing suits, shorts, swimsuits, tank tops; and No. 7,731,281 (filed June 24, 2024 and registered March 18, 2025) in International Class 25 for: Clothing, namely dresses, bathing suit coverups, skirts, pareos. A true and correct copy of Registration Certificate No.

5,649,583 is attached hereto as **Exhibit D**. A true and correct copy of Registration Certificate No.

7,731,281 is attached hereto as **Exhibit E**. The Specimens of Use filed with the USPTO on August

10, 2018, showing Plaintiff's use of the FITS EVERY BODY TO A T mark on apparel hang tags.

These specimens establish Plaintiff's commercial use of the mark more than thirteen months before

Defendant launched its FITS EVERYBODY collection in September 2019.



20.    Plaintiff's registrations constitute prima facie evidence of the validity of the Plaintiff Mark, Plaintiff's ownership of the Plaintiff Mark, and Plaintiff's exclusive right to use the Plaintiff Mark in commerce in connection with the registered goods. Moreover, because Plaintiff filed its initial application on an intent-to-use basis under 15 U.S.C. § 1051(b), Plaintiff's constructive first use date is December 4, 2015 – the filing date of the application – which establishes Plaintiff's nationwide priority over any party who adopted a confusingly similar mark after that date. Defendant did not launch its FITS EVERYBODY collection until September 2019, nearly four years after Plaintiff's priority date. And because that priority date is based on Plaintiff's USPTO filing, Defendant had at the very least constructive notice of Plaintiff's Mark.

21.    Registration No. 5,649,583 has achieved incontestable status under 15 U.S.C. § 1065.

22.    The timeline of Plaintiff's trademark prosecution is critical to understanding the willfulness of Defendant's infringement. Plaintiff filed its intent-to-use trademark application on December 4, 2015, establishing her nationwide priority date under 15 U.S.C. § 1057(c) – nearly four years before Defendant launched its FITS EVERYBODY collection in September 2019 and nearly four years before Defendant even existed as a company. The USPTO granted Plaintiff a Notice of Allowance on March 21, 2017, more than two years before Defendant's launch in 2019. Plaintiff's registration was issued on January 15, 2019, eight months before Defendant's launch. At every stage of this timeline, Plaintiff's rights were senior to any rights Defendant could possibly claim, and at every stage, Plaintiff's pending application and subsequent registration were publicly available in the USPTO's searchable database. Any competent trademark clearance search – especially that of the kind that a company backed by a billionaire celebrity would be expected to

conduct before launching a major product line – would have revealed Plaintiff's prior rights and priority date. Defendant has no excuse for its failure to discover and respect those rights.

23.    Through continuous use, Plaintiff has developed substantial goodwill in the Plaintiff Mark, which functions as a source identifier indicating that goods bearing the mark originate from Plaintiff.

**Defendant's Adoption and Use of a Confusingly Similar Mark**

24.    After Plaintiff's first use and federal registration of the Plaintiff Mark, Defendant adopted and began using the mark FITS EVERYBODY (the "Infringing Mark"). According to the sworn declaration of Defendant's Vice President of Performance Marketing, Defendant first launched the FITS EVERYBODY collection on or about September 10, 2019, more than eight months after Plaintiff obtained federal registration of its mark on January 15, 2019. A true and correct copy of the Hillen Declaration is attached from the USPTO record hereto as **Exhibit F**.

25.    The Infringing Mark incorporates the dominant wording of the Plaintiff Mark, "FITS EVERY BODY," differing only by minor spacing and the omission of the phrase "TO A T."

26.    Defendant uses the Infringing Mark as a source identifier and brand designation, not merely as a descriptive phrase. Defendant treats "FITS EVERYBODY" as a proprietary brand name for a distinct product collection, featuring it prominently in website navigation, marketing materials, advertising and product labeling. Consumers encountering the mark understand it to identify a specific SKIMS product line, not merely to describe an attribute of the goods.

27.    Defendant's use of the Infringing Mark is in commerce and in connection with the advertising, offering for sale, and sale of goods. Defendant has sold and continues to sell goods

bearing the Infringing Mark throughout the United States, including in this District, through its website, retail stores, and wholesale partners.

28.    The Plaintiff Mark and the Infringing Mark are highly similar in appearance, sound, meaning, and overall commercial impression.

29.    Defendant markets the "FITS EVERYBODY" collection as its flagship product line. On Defendant's website (skims.com), the "FITS EVERYBODY" collection is described as Defendant's "best-selling collection." This description appears prominently on the collection's dedicated landing page at skims.com/collections/fits-everybody, which states: "Our best-selling collection made with a buttery soft fabric that molds to your body and never loses shape."



30.    Defendant's characterization of "FITS EVERYBODY" as its "best-selling collection" is reflected in the prominent placement the collection receives throughout Defendant's website. On the Collections page (skims.com/pages/skims-collections), "FITS EVERYBODY" appears first among all of Defendant's product collections—ahead of Cotton, Seamless Sculpt, SKIMS Ultimate, Soft Lounge, and dozens of other collections. This placement is not alphabetical;

it reflects Defendant's deliberate decision to feature "FITS EVERYBODY" as its most commercially important product line.



31.    Similarly, in the main navigation menu of Defendant's website, "Fits Everybody" is listed first under "Featured" collections, again reflecting Defendant's prioritization of this collection above all others.



32. The "FITS EVERYBODY" collection has expanded significantly since its launch in September 2019. The collection now includes bras (including T-shirt bras, push-up bras, scoop bras, and triangle bras), bralettes, underwear (including thongs, briefs, cheeky styles, and boy shorts), bodysuits, tanks, slip dresses, onesies, and loungewear. On information and belief, Defendant has deliberately and continuously expanded the "FITS EVERYBODY" product line under the Infringing Mark, building substantial brand equity around a mark confusingly similar to Plaintiff's senior registered trademark. A representative product page from the FITS EVERYBODY collection is attached hereto as **Exhibit G**.

33. The "FITS EVERYBODY T-Shirt Bra" is featured as a highlighted product in the "Bras" section of Defendant's website navigation, with its own promotional image and callout, further demonstrating the commercial centrality of the Infringing Mark to Defendant's business.



## The Commercial Significance of the "FITS EVERYBODY" Product Line

34.    The "FITS EVERYBODY" collection is not merely one product line among many for Defendant. It is the cornerstone of Defendant's business, the foundation upon which Defendant built its billion-dollar empire, and the primary driver of Defendant's commercial success. The evidence establishing this fact is overwhelming and comes from Defendant's own marketing materials, public statements, and independent market analysis.

35.    Defendant's Own Admissions. On Defendant's website (skims.com), the "FITS EVERYBODY" collection is prominently described as Defendant's "best-selling collection." This characterization appears on the collection's dedicated landing page at skims.com/collections/fits-everybody, which states: "Our best-selling collection made with a buttery soft fabric that molds to your body and never loses shape." In a separate post published by Defendant titled "The Reason Fits Everybody is Our Top Rated Collection," Defendant further describes Fits Everybody as "among our most popular" collections and explains that "it's easy to see why the Fits Everybody collection is among our most popular." This page, formerly accessible at skims.com/blogs/tv/the-

reason-fits-everybody-is-our-top-rated-collection, has been preserved in the Internet Archive's Wayback Machine, with captures dating from August 2021 through at least January 2023. Defendant has consistently promoted "FITS EVERYBODY" as its flagship collection across its social media platforms. In a July 15, 2021 Facebook post, Defendant stated: "With over 4,500 5-star reviews, Fits Everybody is our best-selling collection for a reason. Just wait until you try it - you won't want to wear anything else."





THE REASON FITS EVERYBODY IS OUR TOP RATED COLLECTION

SHARE:



36.    In April 2024, Defendant launched its mobile app for iOS and Android devices. In promotional materials for the app launch, including an Instagram video posted to Defendant's official account, the "FITS EVERYBODY" collection is displayed as the first and most prominent collection in the app's shopping interface, appearing above "New" and "Best Sellers" categories. The promotional video describes the collection as offering a "five-star fit and feel."



37.    <u>Independent Market Data.</u> Independent retail tracking conducted by RetailBoss, analyzing SKIMS's e-commerce performance in 2025, found that the Underwear & Socks category, which encompasses the core "FITS EVERYBODY" products, generated approximately $371.3 million in tracked U.S. e-commerce revenue, representing approximately 45-50% of Defendant's total weekly e-commerce sales. This category dominated all other product categories by a significant margin, with the second-largest category, Tops, generating only $135.8 million, and Bottoms generating $81.3 million. The RetailBoss analysis further noted that customer feedback "consistently highlighted comfort, fit, and quality, particularly for the 'Fits Everybody' and 'Soft Lounge' collections." A copy of the RetailBoss analysis is attached hereto as **Exhibit C**.

17

38.    Media Recognition. Major fashion publications have consistently identified "FITS EVERYBODY" as SKIMS's flagship and most popular collection. Refinery29, in a July 2022 feature article, described Fits Everybody as "the brand's most popular line." In a separate best-sellers guide, Refinery29 stated that "Skims' most beloved collection is Fits Everybody." The collection has been the subject of dedicated feature articles, reviews, and best-seller guides across fashion media outlets, further cementing its status as Defendant's signature product offering. Copies of the Refinery29 articles are attached hereto as **Exhibits H** and **I**.

39.    Marketing Investment. Defendant has invested tens of millions of dollars specifically promoting the "FITS EVERYBODY" collection through high-profile celebrity campaigns. For example, in April 2022, Defendant launched the "Icons" campaign featuring supermodels Tyra Banks, Heidi Klum, Alessandra Ambrosio, and Candice Swanepoel, specifically spotlighting the "FITS EVERYBODY" underwear collection.



**SKIMS** ✔
April 4, 2022 · 🌐                                          •••

Tyra Banks and Heidi Klum for SKIMS Fits Everybody.

https://skims.social/fb-fe



40.    According to the sworn Declaration of Paul Hillen, Defendant's Vice President of Performance Marketing, submitted to the USPTO on November 5, 2025, Defendant spent $630,000 in campaign spending plus $550,000 in Meta advertising for this campaign alone.

41.    Subsequent campaigns featuring celebrities such as Sabrina Carpenter ($2.2 million in 2024) and WNBA players including Candace Parker, Cameron Brink, Dijonai Carrington, Kelsey Plum, and Skylar Diggins-Smith further promoted the "FITS EVERYBODY" collection, with total marketing investments specifically attributable to the Infringing Mark exceeding $8

million through 2024. Representative images from Defendant's celebrity marketing campaigns featuring the FITS EVERYBODY collection are above and in **paragraph 104, below**.

42.    Upon information and belief, Plaintiff estimates that Defendant's cumulative revenues from goods bearing the Infringing Mark through Q1 2026 now exceed $700 million using conservative estimates, and may exceed $900 million when applying independent retail tracking ratios, with estimated profits of $164-225 million or more.

43.    Inconsistency in Defendant's Statements. There is a significant discrepancy between Defendant's public marketing characterization of "FITS EVERYBODY" as its "best-selling collection" and the revenue figures set forth in the Hillen Declaration. The Hillen Declaration indicates that "FITS EVERYBODY" revenues represented only approximately 16% of Defendant's total reported company revenues for 2024 ($144 million of approximately $900 million). Independent financial reporting underscores the scale of Defendant's operations: the Financial Times reported in October 2024 that SKIMS's total company revenue in 2023 was nearly $713 million, reflecting 45 percent year-over-year growth. A true and correct copy of the Financial Times article is attached hereto as **Exhibit K**. If "FITS EVERYBODY" is truly Defendant's "best-selling collection," it is difficult to reconcile how this flagship product line would represent only 16 percent of total revenues, particularly when independent retail tracking data indicates the relevant product categories account for 45-50 percent of e-commerce sales.

**SEO Suppression, Market Saturation, and Loss of Online Visibility**

44.    Prior to Defendant's adoption and promotion of the Infringing Mark, consumers searching the Internet for Plaintiff's business name and brand were readily directed to Plaintiff's website through search engine results.

45. Defendant has since saturated the market with use of the Infringing Mark through extensive advertising, media coverage, press features, and online promotion – all greatly amplified by the celebrity status and media omnipresence of its founder, Kim Kardashian. Defendant's market saturation was not achieved through years of gradual brand-building, as Plaintiff's would have to be, but through the deployment of massive financial resources and celebrity influence that enabled Defendant to flood the marketplace virtually overnight.

46. As a result of Defendant's market dominance and widespread promotion of goods under the Infringing Mark, Defendant almost immediately occupied a disproportionate share of search engine results associated with the relevant brand terms, and does so even more today.

47. On information and belief, Defendant's use of the Infringing Mark has pushed Plaintiff's website and online presence significantly lower in search engine rankings, making it more difficult, if not impossible, for consumers to locate or discover Plaintiff's business when searching for women's apparel or Plaintiff's brand.

48. Defendant's dominance of search results and online visibility under the Infringing Mark has impaired Plaintiff's ability to be found by existing and potential customers, disrupted Plaintiff's customer acquisition channels, and interfered with Plaintiff's ability to build brand awareness, make sales and compete fairly in the marketplace.

49. This loss of online visibility has harmed Plaintiff's sales, brand recognition, and opportunities for revenue and growth, and constitutes a concrete form of irreparable harm not fully compensable by monetary damages alone.

50. Defendant's flooding of search engine results and online media under a confusingly similar mark exemplifies text-book reverse confusion, in which Defendant's overwhelming

commercial presence causes Plaintiff's senior brand to be eclipsed and misperceived as subordinate, affiliated or as the infringing party.

**Overlapping Goods, Channels of Trade, and Consumers**

51.    Defendant uses the Infringing Mark on goods that are identical, similar or closely related to Plaintiff's goods, including apparel in International Class 25.

52.    Plaintiff's and Defendant's goods are marketed to overlapping consumer bases.

53.    Plaintiff's and Defendant's goods travel through overlapping channels of trade, including online retail, social-media marketing, and direct-to-consumer sales.

**Likelihood of Confusion and Reverse Confusion**

54.    Defendant's use of the Infringing Mark is likely to cause confusion as to source, affiliation, sponsorship, or approval.

55.    Because Defendant possesses extraordinary market power and advertising reach, consumers who even find Plaintiff's brand or goods are likely to mistakenly believe that Plaintiff's goods are affiliated with or authorized by Defendant, or copying Defendant's brand.

56.    Defendant's conduct threatens to and has overwhelmed Plaintiff's brand identity, impaired Plaintiff's goodwill and ability to develop goodwill, and deprived Plaintiff of control over the reputation symbolized by Plaintiff's Mark.

57.    In this case, both forward and reverse confusion are likely. Consumers encountering Plaintiff's goods may mistakenly believe they originate from, are sponsored by,  are affiliated with Defendant due to the similarity of the marks and the identity of the goods. Conversely, Defendant's extraordinary market power, celebrity-amplified visibility, and advertising saturation make it highly likely that consumers will view Plaintiff as the junior user, copycat, or licensee when in fact Plaintiff is the senior user with long established rights.

**Commercial Strength of Defendant's Junior Mark**

58.    Defendant has invested tens of millions of dollars in advertising and promoting the Infringing Mark, including through national advertising campaigns, social media marketing, partnerships with major retailers, celebrity endorsements, influencer collaborations, and widespread press features in fashion and lifestyle media. According to the Hillen Declaration, Defendant's marketing investments specifically attributable to the "FITS EVERYBODY" collection exceeded $8 million through 2024 alone.

59.    Defendant's brand benefits from the celebrity status and social media following of its founder, Kim Kardashian, whose personal platforms reach over 350 million followers across Instagram and other channels. This celebrity platform provides Defendant with promotional reach and brand visibility unattainable for small businesses like Plaintiff, enabling rapid nationwide market saturation of any product line Defendant chooses to launch.

60.    Defendant distributes goods bearing the Infringing Mark through nationwide channels including its e-commerce platform, retail partnerships, pop-up stores, and direct-to-consumer sales, achieving widespread market availability and deep market penetration across the United States.

61.    Defendant's substantial advertising budget, nationwide distribution network, celebrity-amplified brand recognition, and deeply entrenched customer relationships enable Defendant to saturate the marketplace with the Infringing Mark. Defendant's founder, Kim Kardashian, is a billionaire with access to capital, media attention, and promotional platforms that Plaintiff could never dream of matching. This extraordinary commercial strength demonstrates precisely how easily Defendant's junior mark can – and has – swamped and eclipsed Plaintiff's senior mark in the relevant marketplace. In the reverse confusion context, the very commercial

strength that would ordinarily favor a trademark defendant instead evidences Defendant's capacity to cause confusion and harm when that defendant has knowingly adopted a mark confusingly similar to a smaller competitor's earlier mark.

**Reverse Confusion Intent and Knowledge**

62. Defendant's intent to infringe can be inferred from its adoption and continued use of the Infringing Mark with actual and constructive knowledge of Plaintiff's senior rights.

63. Defendant, a company founded by one of the most famous people in the world with access to hundreds of millions of dollars in capital and a built-in audience of over 350 million social media followers, adopted a mark confusingly similar to that of a small, woman-owned business with a tiny fraction of those resources. With its vastly superior market power, Defendant proceeded in a manner that made it highly likely consumers would view Plaintiff as a copycat, an affiliate, or subordinate to Defendant. The outcome was entirely predictable and, on information and belief, entirely intended.

64. Defendant had constructive knowledge of Plaintiff's rights through Plaintiff's federal trademark filings and registrations, which are publicly available and searchable in the USPTO database, and which predate Defendant's adoption and use of the Infringing Mark by years.

65. Defendant acquired actual knowledge of Plaintiff's rights no later than September 13, 2024, when Plaintiff sent Defendant a detailed cease-and-desist letter.

66. Despite this actual knowledge, and with full awareness of its own vastly superior market power and advertising reach, Defendant deliberately chose to continue using the Infringing Mark and, on information and belief, expanded its use of the mark, increased advertising and promotion, and broadened the range of goods offered under the mark.

24

67.     Defendant's decision to proceed with a confusingly similar mark while knowing of Plaintiff's senior rights and possessing the market dominance necessary to overwhelm Plaintiff's brand identity supports an inference of intent or, at minimum, reckless disregard of Plaintiff's rights and the likelihood of reverse confusion.

**Real-World Effect on Plaintiff's Brand**

68.     The real-world effect of Defendant's conduct has been to cause consumers to perceive Plaintiff as a copycat, an affiliate of Defendant, or as subordinate to Defendant's brand, when in fact Plaintiff is the senior user with established trademark rights, and that is when consumers can even find Plaintiff's brand or website, which has been pushed so far down the search engine rankings as to be invisible to target or existing consumers. This is the inevitable result when a company backed by a billionaire celebrity with a global media platform decides to take a mark that belongs to a small business owner. The small business owner is erased, and the celebrity-backed company takes over – not because the celebrity company has superior rights, but because it has superior resources.

69.     Defendant's overwhelming commercial presence – built on the personal fortune, celebrity connections, and global media platform of its founder, Kim Kardashian – has deprived Plaintiff of control over the reputation and goodwill symbolized by the Plaintiff Mark, causing consumers to associate the mark primarily or exclusively with Defendant rather than with Plaintiff. This is not a case of fair competition but a case of a billionaire-backed company using its vastly superior resources to take what belongs to someone else.

**Notice, Letter of Protest, USPTO Proceedings, and Willfulness**

70.     Defendant had constructive notice of Plaintiff's trademark rights long before Plaintiff sent its cease-and-desist letter. Plaintiff's first trademark application was on file with the

25

USPTO beginning December 4, 2015 – nearly four years before Defendant launched its FITS EVERYBODY collection and before Defendant even existed as a company. A Notice of Allowance issued on March 21, 2017, and Plaintiff's registration issued on January 15, 2019 – eight months before Defendant's September 2019 launch. This information was publicly available in the USPTO's searchable trademark database at all relevant times. A company with access to sophisticated legal counsel has no excuse for failing to conduct a basic trademark clearance search before launching a major product line. On information and belief, Defendant either conducted such a search and knowingly proceeded in disregard of Plaintiff's rights, or recklessly failed to conduct any search at all. Either scenario demonstrates willfulness or, at minimum, reckless disregard of Plaintiff's rights.

71.    Plaintiff's second trademark application, filed on June 24, 2024, provided Defendant with yet another opportunity to discover Plaintiff's prior rights and yet another basis for constructive notice.

72.    Upon information and belief, by June 2024, Defendant had generated hundreds of millions of dollars in revenue from goods bearing that mark. A company of Defendant's size and sophistication, with ongoing trademark matters of its own before the USPTO, would reasonably be expected to monitor the trademark register for conflicting applications. As of the date of this filing, the USPTO's Trademark Electronic Search System (TESS) lists Defendant as the owner of twenty-seven trademark filings; Defendant's founder Kim Kardashian has at least eight additional filings in her own name; and Kardashian's holding company, Kimsaprincess, Inc., has 229 filings, including filings for the names of Kardashian's four children. Representative TESS search results are attached to the Complaint in paragraph 104, below.

73. Plaintiff's June 2024 application for FITS EVERY BODY TO A T in International Class 25 for clothing - its second application for the mark - was publicly available in the USPTO database months before Plaintiff sent its cease-and-desist letter. Defendant's continued and expanded use of the Infringing Mark after this filing, and after five years of constructive notice through Plaintiff's first registration, further demonstrates Defendant's willful disregard of Plaintiff's rights.

74. On September 13, 2024, Plaintiff, through counsel, sent Defendant a cease-and-desist letter providing detailed notice of Plaintiff's senior trademark rights and demanding that Defendant cease use of the Infringing Mark. A true and correct copy of the cease-and-desist letter is attached hereto as **Exhibit J**.

75. Plaintiff's counsel had a subsequent call with counsel for the Defendant to discuss the cease-and-desist letter and the substance of our claims. Counsel for Defendant indicated that the Defendant was not likely to cease and desist.

76. Defendant in fact did not cease and desist use of the Infringing Mark following that notice and phone conversation.

77. On information and belief, Defendant continued to use the Infringing Mark, increased advertising and promotion of the mark, and expanded the scope of goods offered under the mark after receiving actual notice of Plaintiff's rights.

78. Defendant's willfulness is further demonstrated by Defendant's continued expansion of the "FITS EVERYBODY" product line after receiving notice of Plaintiff's rights. Rather than transitioning away from the Infringing Mark upon learning of Plaintiff's senior rights, Defendant doubled down by adding new product categories, increasing marketing investment, developing additional celebrity and brand collaborations, and building additional brand equity

27

around the Infringing Mark. On information and belief, Defendant has added multiple new product categories and brand collaborations to the "FITS EVERYBODY" collection since receiving Plaintiff's cease-and-desist letter in September 2024 and since the USPTO's refusal of Defendant's application.

79.    Just a few weeks after receiving Plaintiff's cease-and-desist letter, on October 5, 2024, Kim Kardashian personally promoted SKIMS and the "FITS EVERYBODY" collection in a cover story for the Financial Times' How To Spend It (HTSI) magazine titled "Under her Skims: inside Kim Kardashian's $4bn apparel empire." The article specifically discussed the "Fits Everybody" product line.  Kardashian promoted the article to her approximately 360 million Instagram followers, writing: "What a journey! Celebrating 5 years of @SKIMS and sharing our brand story in this month's Financial Times HTSI." The article is attached hereto as **Exhibit K**.



80.    Upon information and belief, Defendant's decision to continue investing in and expanding the "FITS EVERYBODY" collection, rather than developing an alternative brand name, reflects a calculated business judgment that the profits to be gained from continued

28

infringement would exceed any potential legal liability, and that the cost of rebranding would be too high. This is precisely the predatory, profit-maximizing conduct that the Lanham Act's enhanced remedies provisions are designed to deter.

81.    Despite receiving Plaintiff's cease-and-desist letter on September 13, 2024, and despite the USPTO's refusal to register Defendant's mark based on likelihood of confusion with Plaintiff's mark, Defendant has aggressively expanded its use of the Infringing Mark, including in New York.

82.    In December 2024 – three months after receiving Plaintiff's cease-and-desist letter, and just weeks after the USPTO issued its final refusal of Defendant's trademark application – Defendant opened its first-ever flagship store at 647 Fifth Avenue in New York City. The store spans 6,570 square feet across three levels in a building formerly occupied by Versace, situated next to Cartier in one of the most prestigious retail corridors in the world. Defendant's founder, Kim Kardashian, personally hosted a star-studded grand opening party attended by celebrities including Cardi B, Ciara, Paris Hilton, Ice Spice, and others. The opening received widespread media coverage, further saturating the market with Defendant's brand and the Infringing Mark.



83.    Defendant's New York expansion did not stop there. In January 2025, Defendant opened a Valentine's Day pop-up shop in SoHo. In March 2025, Defendant installed a 60-foot inflatable balloon depicting Kim Kardashian in Times Square to promote its swimwear collection bearing the Infringing Mark, and hosted a retail activation at Bloomingdale's on 59th Street. In September 2025, Defendant launched its NikeSKIMS collaboration at Nike's House of Innovation store in New York City, with Kim Kardashian and other celebrities in attendance. Upon information and belief, at least some of these promotions involved Defendant's FITS EVERYBODY product line or products.

84.    Each of these activations occurred after Defendant had actual notice of Plaintiff's senior trademark rights. Rather than ceasing its infringing conduct, Defendant doubled down, investing millions of additional dollars in promoting the Infringing Mark and expanding its physical retail presence in Plaintiff's home market. This course of conduct demonstrates that Defendant's infringement is not inadvertent, but knowing, willful and deliberate.

30

85.    On January 16, 2024, Defendant filed an application with the United States Patent and Trademark Office, U.S. Serial No. 98359057, seeking registration of the Infringing Mark.

86.    Plaintiff submitted a Letter of Protest pursuant to 37 C.F.R. § 2.149, addressed to the USPTO Director through the Office of the Deputy Commissioner for Trademark Examination Policy, submitting objective evidence bearing on the registrability of Defendant's mark and Plaintiff's senior rights.

87.    The Office of the Deputy Commissioner reviewed the Letter of Protest and determined that it complied with Rule 2.149 and that the evidence warranted inclusion in the application record.

88.    The evidence accepted through the Letter of Protest was forwarded into the application record for consideration by the examining attorney.

89.    Upon review of the application record, including the evidence submitted through the Letter of Protest, the examining attorney issued an Office Action refusing registration of Defendant's application under Section 2(d) of the Lanham Act based on likelihood of confusion with Plaintiff's registered marks.

90.    Defendant attempted to overcome the refusal and failed.

91.    On December 4, 2025, the examining attorney issued a final refusal maintaining the Section 2(d) refusal. To date, Defendant has not filed an appeal.

92.    Defendant has continued to use the Infringing Mark in commerce despite notice through the cease-and-desist letter, the Director-level review and acceptance of the Letter of Protest, the examining attorney's refusal, and the final refusal.

**Plaintiff's Estimated Revenues and Profits**

31

93.    Upon information and belief, and based on Defendant's sworn statements, public disclosures, and independent market data, Plaintiff believes Defendant's revenues from goods bearing the Infringing Mark are as follows:

94.    Historical Revenues (2019-2024) Per Hillen Declaration. According to the Hillen Declaration, Defendant generated the following revenues from goods bearing the Infringing Mark: $2 million in 2019, $12 million in 2020, $41 million in 2021, $82 million in 2022, $126 million in 2023, and $144 million in 2024. The subtotal for this period is $407 million.

95.    Estimated 2025 Revenues. Defendant announced in November 2025, in connection with its $225 million funding round led by Goldman Sachs Alternatives, that it expected to exceed $1 billion in total company net sales for 2025. Independent retail tracking indicates the Underwear & Socks category, which includes the core "FITS EVERYBODY" products, accounts for approximately 45-50% of Defendant's e-commerce sales. However, the Hillen Declaration suggests "FITS EVERYBODY" revenues represented only approximately 16% of total company revenues in 2024. Using the conservative 16% ratio applied to Defendant's projected 2025 revenues of $1 billion or more, estimated 2025 "FITS EVERYBODY" revenues would be at least $160 million. Using the 45-50% ratio indicated by independent retail tracking data, 2025 "FITS EVERYBODY" revenues could be as high as $450-500 million. Upon information and belief, Plaintiff conservatively estimates 2025 "FITS EVERYBODY" revenues at $200-250 million, accounting for the collection's status as Defendant's "best-selling" line while recognizing that the full extent of revenues will be determined through discovery.

96.    Estimated 2026 YTD Revenues (January-March 2026). Defendant has continued aggressive expansion of the "FITS EVERYBODY" collection into 2026, including opening a new flagship store in Chicago's Gold Coast neighborhood in February 2026 (6,500 square feet, two

floors, in a former 1960s bank building) and its largest store to date at Mall of America in Minnesota (8,000 square feet). Defendant has announced plans to open additional flagship locations throughout 2026, including its first UK store on Regent Street in London (12,000 square feet, scheduled for summer 2026). Based on Defendant's historical growth trajectory and continued market dominance and upon information and belief, Plaintiff conservatively estimates Q1 2026 "FITS EVERYBODY" revenues at $50-75 million.

97. <u>Total Estimated Revenues from Infringing Mark</u>. According to the Hillen Declaration, Defendant generated $407 million in revenues from goods bearing the Infringing Mark from 2019 through 2024. Based on Defendant's projected 2025 total company revenues exceeding $1 billion and the collection's status as Defendant's "best-selling" line, and upon information and belief, Plaintiff conservatively estimates 2025 revenues from goods bearing the Infringing Mark at $200-250 million. Based on Defendant's continued expansion in 2026, including new flagship store openings, and upon information and belief, Plaintiff conservatively estimates revenues from goods bearing the Infringing Mark for the first quarter of 2026 at $50-75 million. In total, Plaintiff estimates that Defendant's cumulative revenues from goods bearing the Infringing Mark from 2019 through March 2026 are approximately $657-732 million using conservative estimates, and potentially $900 million or more when applying the revenue proportions indicated by independent retail tracking data.

98. <u>Estimated Profits.</u> Defendant is reportedly highly profitable. CEO Jens Grede announced an estimated net profit of approximately $190 million for 2023, representing a net profit margin of approximately 25% on $750 million in total company revenue. Upon information and belief, SKIMS benefits from high gross margins typical of the apparel industry, estimated at 50-60%, and an EBITDA margin exceeding 23% according to a 2023 investor pitch deck. Applying

33

a 25% net profit margin to the estimated "FITS EVERYBODY" revenues, Plaintiff estimates that Defendant's profits from goods bearing the Infringing Mark total between $164 million and $183 million using the conservative revenue estimate of $657-732 million. Using the higher revenue estimate of $900 million or more based on independent retail tracking ratios, Defendant's profits from goods bearing the Infringing Mark would be $225 million or more.

99.    Plaintiff reserves the right to amend these calculations based on discovery of the true revenues and profits attributable to goods bearing the Infringing Mark, including revenues and profits that may have been omitted from or understated in the Hillen Declaration.

**Damages and Harm**

100.  Defendant's conduct has injured and continues to injure Plaintiff by impairing Plaintiff's goodwill, diminishing the distinctiveness of the Plaintiff Mark, and interfering with Plaintiff's ability to control its brand identity or be found by target or existing customers.

101.  Defendant's marketing of "FITS EVERYBODY" as its "best-selling collection," combined with the prominent placement of the collection on Defendant's website and in Defendant's navigation, demonstrates that the Infringing Mark is central to consumer recognition, purchase decisions, and brand identity. Consumers seek out "FITS EVERYBODY" products specifically, and the mark drives the sale. Accordingly, any attempt by Defendant to apportion profits away from the Infringing Mark should be rejected or limited to a de minimis amount.

102.  Plaintiff has suffered and will continue to suffer irreparable harm absent injunctive relief.

103.  As set forth above, Defendant has generated gross revenues exceeding $700 million from sales of goods bearing the Infringing Mark through the first quarter of 2026 using conservative estimates, and potentially exceeding $900 million when applying independent retail

34

tracking ratios, with estimated profits of $164-225 million or more. These figures, derived from Defendant's own sworn statements and corroborated by independent market data, provide the basis for Plaintiff's claims for disgorgement of profits and damages.

104. The Declaration further establishes that Defendant has invested millions of dollars in marketing and promoting the Infringing Mark, including: $710,000 for a Kate Moss campaign in 2021; $630,000 in campaign spending plus $550,000 in Meta advertising in 2022 featuring celebrities Tyra Banks, Heidi Klum, Alessandra Ambrosio, and Candice Swanepoel; $3.5 million in campaign spending plus $1.3 million in Meta advertising in 2023 featuring SZA, Kim Cattrall, Hari Nef, Lana Condor, Coco Jones, and Nelly Furtado; and $2.2 million in campaign spending in 2024 featuring Sabrina Carpenter and a WNBA partnership with Candace Parker, Cameron Brink, Dijonai Carrington, Kelsey Plum, and Skylar Diggins-Smith. These marketing investments have achieved a social media reach of 3 billion impressions and $230 million in earned media value in 2024 alone.







FASHION

## WNBA stars Cameron Brink, Candace Parker and more strip down for new Skims campaign

By Kristin Contino
Published May 13, 2024, 1:39 p.m. ET

🗩 14 Comments

Skims is getting sporty.

Kim Kardashian is bringing some ballers to her latest Skims campaign, tapping WNBA stars Candace Parker, Dijonai Carrington, Kelsey Plum and Skylar Diggins-Smith as well as newcomer Cameron Brink to star in her brand's new lingerie campaign announcing her partnership with the league.

"As the official underwear of the @WNBA, Skims is as comfortable as it gets," Skims posted on Instagram Monday, sharing a video of the basketball stars modeling various nude shades of the brand's "Fits Everybody" line.





WNBA superstar Candace Parker showed off her Skims.
Hugh Wilson x Skims



Dijonai Carrington wore the brand's boy shorts.
Hugh Wilson x Skims



Kelsey Plum accessorized with a belly chain.
Hugh Wilson x Skims

In the shots, each player sports a pair of underwear and the Skims Fits Everybody Bandeau ($28) in shades to complement their skin tones.

The WNBA stars also held special WNBA x Skims balls in colors to match their undies as they accessorized with bold statement necklaces, earrings and belly chains.

"Championing women and women in sports is incredibly important to Skims," the "Kardashians" star, 43, said in a press release.

_____

*"WNBA stars Cameron Brink, Candace Parker and more strip down for new Skims campaign,"* By Kristin Contino, Page Six, (May 13, 2024).

105. On information and belief, the revenue figures set forth in the Hillen Declaration may understate the true revenues attributable to goods bearing the Infringing Mark. Defendant's own website describes "FITS EVERYBODY" as its "best-selling collection," yet the sworn figures in the Hillen Declaration indicate that "FITS EVERYBODY" revenues represented only approximately 16% of Defendant's total reported company revenues for 2024 ($144 million of approximately $900 million). If "FITS EVERYBODY" is truly Defendant's "best-selling collection," a 16% revenue share appears inconsistent with that characterization and warrants scrutiny.

106. The Hillen Declaration was submitted to the USPTO on November 5, 2025, more than one year after Plaintiff sent Defendant a cease-and-desist letter on September 13, 2024, and after Defendant was aware that Plaintiff was asserting trademark infringement claims. On information and belief, Defendant was in a litigation posture at the time the Declaration was prepared and submitted, and the figures contained therein should be examined in that light.

107. Plaintiff reserves the right to amend this Complaint to seek additional damages based on discovery of the true revenues attributable to goods bearing the Infringing Mark, including revenues that may have been omitted from or understated in the Hillen Declaration.

39

108. Defendant's own admissions establish a minimum floor for the disgorgement of profits, damages, and other monetary relief to which Plaintiff is entitled, and further demonstrate the willful and knowing nature of Defendant's infringement.

109. Defendant is a sophisticated company valued in the billions of dollars with access to experienced legal counsel. Defendant knew or should have known of Plaintiff's senior rights before adopting the Infringing Mark. Defendant received actual notice through Plaintiff's cease-and-desist letter and through the USPTO's initial and final refusals to register Defendant's mark based on likelihood of confusion with Plaintiff's mark. Despite this knowledge, Defendant continued and expanded its use of the Infringing Mark.

## COUNT I – TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114

110. Plaintiff repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

111. Plaintiff owns valid, protectable trademark rights in the Plaintiff Mark.

112. Defendant has used in commerce, without Plaintiff's consent, the Infringing Mark in connection with the advertising, offering for sale, and sale of goods.

113. Defendant's use is likely to cause confusion, mistake, or deception as to affiliation, connection, sponsorship, or approval, including by reverse confusion.

114. Defendant's conduct constitutes trademark infringement under 15 U.S.C. § 1114.

115. Defendant's infringement has been willful. Defendant had constructive notice of Plaintiff's rights through Plaintiff's federal registrations, which predate Defendant's adoption of the Infringing Mark by nearly four years. Defendant acquired actual notice of Plaintiff's rights no later than September 2024, when Plaintiff sent a cease-and-desist letter. Despite this knowledge, Defendant continued and expanded its use of the Infringing Mark, opened new retail locations,

launched new product categories, and invested millions of additional dollars in marketing and promoting goods bearing the Infringing Mark. The USPTO subsequently refused registration of Defendant's mark based on likelihood of confusion with Plaintiff's mark, and Defendant continued its infringing conduct after both the initial refusal and the final refusal. This conduct constitutes willful infringement or, at minimum, reckless disregard of Plaintiff's rights, and Plaintiff is entitled to enhanced remedies under 15 U.S.C. § 1117(a), including disgorgement of Defendant's profits, treble damages, and attorneys' fees.

## COUNT II – FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION
### 15 U.S.C. § 1125(a)

116.  Plaintiff repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

117.  Defendant has used in commerce a word, term, name, symbol, or device likely to cause confusion as to the origin, sponsorship, or approval of goods.

118.  Defendant's conduct constitutes false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a).

## COUNT III – NEW YORK COMMON-LAW UNFAIR COMPETITION

119.  Plaintiff repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

120.  Defendant misappropriated Plaintiff's goodwill and labors by adopting and using a confusingly similar mark with knowledge of Plaintiff's senior rights. Defendant had constructive knowledge through Plaintiff's federal registrations and, on information and belief, acquired actual knowledge including but not limited to knowledge obtained through Plaintiff's cease-and-desist letter, the USPTO's refusal of Defendant's application, and Defendant's own due diligence and

41

trademark searches. Despite this knowledge, Defendant – a company with access to sophisticated legal counsel and virtually unlimited financial resources – deliberately continued and expanded its use of the Infringing Mark in bad faith, confident that Plaintiff would be unable to stop them.

121.  Defendant's conduct constitutes unfair competition under New York common law.

## COUNT IV – UNJUST ENRICHMENT
### (New York Common Law)

122.  Plaintiff repeats and realleges the allegations of the previous paragraphs as though fully set forth herein.

123.  Defendant has been enriched at Plaintiff's expense through use of the Infringing Mark. Defendant has generated over $700 million using conservative estimates, and potentially over $900 million, in revenues from goods bearing a mark confusingly similar to Plaintiff's senior mark – revenues that Defendant obtained while knowing of Plaintiff's prior rights and while knowing that its overwhelming market power would make it difficult or impossible for Plaintiff to compete. It would be unconscionable to allow Defendant, a company founded by a billionaire celebrity, to retain profits earned through the misappropriation of a small business owner's trademark rights.

124.  Equity and good conscience require disgorgement. It would be fundamentally unjust to allow a billionaire-founded company to retain hundreds of millions of dollars in profits earned through the knowing infringement of a small business owner's trademark rights, particularly where that company proceeded with full awareness that its superior resources would make meaningful resistance unlikely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in its favor and:

42

A. Preliminary and permanent injunctive relief prohibiting Defendant from using the FITS

EVERYBODY mark or any confusingly similar mark, and from engaging in any other unlawful

conduct;

B. Disgorgement of Defendant's profits from its unlawful conduct;

C. Treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a);

D. Plaintiff's costs of corrective advertising;

E. Costs and interest;

F. Such other relief as the Court deems just and proper.


### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

Date: Mar 31, 2026

Respectfully submitted,

By: /s/ Jessica Eaves Mathews                 /s/ Mika Mooney
Jessica Eaves Mathews, Esq.                   Mika Mooney, Esq. (MM0819)
LEVERAGE LEGAL GROUP LLC                       Mika Mooney Law, PLLC
1700 Westlake Ave N, Suite 200                191 Main St., #528
Seattle, WA 98109                             Port Washington, NY 11050
Phone: 888-505-5838                           Phone: 516-206-2018
jessica@leveragelegalgroup.com                mika@mikamooneylaw.com


                                              *Attorneys for Plaintiff*